UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
EASTERN DIVISION

MARIA CORRALES,

        Plaintiff,

v.                                  Case No. 08-00040-AC

MORENO VALLEY UNIFIED          HON. AVERN COHN
SCHOOL DISTRICT,

        Defendant.

_____/

## MEMORANDUM AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT[1]

### I. Introduction

This is a retaliation in employment case. Plaintiff Maria Corrales is a special education teacher whose term was not renewed after having spent more than a year complaining about defendant Moreno Valley Unified School District's (the "school district") handling of her students. Corrales says her firing was in retaliation for her voicing concerns over the district's treatment of her students. The school district says its decision was the product of Corrales' inability to manage her classroom. Corrales brings claims under state and federal law. Before the Court is the school district's motion for summary judgment. For the reasons that follow, the school district's motion will be granted in part and denied in part. Corrales' federal claim under the Rehabilitation Act continues.

_____

[1]The Court deems this matter appropriate for decision without oral argument. See Fed. R. Civ. P. 78(b); Local Rule 7-15.

## II.  Legal Standard

Given that the applicable legal standard for considering motions for summary judgment has long past become firmly established, the Court will briefly state: Summary judgment can be granted only where there is no genuine issue as to any material fact and where the movant is entitled to judgment as a matter of law.  In determining whether these conditions are met the record must be viewed in the light most favorable to the party opposing the motion, with the court indulging in all inferences favorable to that party.  See FED. R. CIV. P. 56(c); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255-56 (1986); Brookside Assocs. v. Rifkin, 49 F.3d 490, 492-93 (9th Cir. 1995).

## III.  Background

### A.  Corrales' Work History

From 2003 to 2005, Corrales was enrolled in an intern program at California State University at San Bernardino to enable her to earn a California special education teaching credential, known as a CLEAR credential.  As part of the intern program, Corrales taught special education classes at the school district on a full-time basis, first at Sunny Meade Elementary School from 2003 to 2004, and then at Edgemont Elementary School during the 2004 to 2005 school year.  For the next two school years (2005 to 2007), Corrales taught first as an intern and then as a probationary instructor at Armada Elementary School.

Towards the end of Corrales' second year in the intern program she taught at Edgemont Elementary School.  During her term, Corrales received a very positive year-end evaluation of her teaching and behavior management skills.  Corrales received

"Satisfactory" ratings (the highest possible) in all performance categories with a comment from the evaluator that Corrales "worked hard to establish a quiet and calm learning environment so students can learn core content standards and succeed."  (Pl's Opp., Ex. B).  Forms completed by the school's principal from his observations of Corrales teaching that were taken throughout the school year likewise provided largely positive assessments of her work performance.  For instance, on one of the observation forms, the school's principal noted that Corrales was calm and positive during the class, that her calm demeanor kept her students focused, an assertive discipline plan was in place, and that the classroom was positive and calm.  Notably, the final observation of Corrales' teaching in the classroom in February 15, 2005, found that "[b]ehavior management was in place[;] students were repeatedly reminded of positive and negative consequences[;] students were prompted often to keep them on task."  (Pl's Opp., Ex. A4).  However, the principal reminded Corrales that she needed to "assist students in developing behaviors to keep them on task and focused on their assignments;" (Pl's Opp., Ex. A1), a recommendation that would be repeated throughout Corrales' evaluations over the remaining three years.  These positive developments in Corrales' management of her classroom, however, did not carry over or at least were not perceived to have carried over by school administrators at the next school where she taught, Armada Elementary School.

Beginning the fall of 2005 and continuing through the end of the 2007 school year, Corrales taught a combination kindergarten and first grade class for mild to moderately disabled students at Armada Elementary School.  Michael Keefe, the principal at Armada School, was Corrales' supervisor.  Keefe first observed Corrales in

the classroom on November 30, 2005.  In his observations from that session, Keefe

noted the following problems with Corrales' management of her classroom,

observations which formed a baseline from which Corrales was later judged against in

evaluating whether she had improved:

> It would be better to put all board items up prior to starting
> the day.  These students are high maintenance and teacher
> time would be better utilized interacting with them than
> writing on the board [to prepare the class for the day's
> session].  The class needs a behavior organizational plan to
> stop the yelling out and inappropriate behavior of [students]
> wandering the room and not following directions.  The class
> needs more structure to assist them in getting into
> curriculum sooner and not having them dictate the schedule
> with their behavior.  Organizational items need to be done
> prior to start of class such as sharpening pencils.

(Pl's Opp., Ex. K).

Keefe's subsequent observations of Corrales' classroom performance showed

improvement in most of the areas mentioned in his November 30, 2005, form save for

one where her improvement was more muted --- behavior modification.  Thus, in

January 20, 2006, Keefe observed that Corrales' "lesson was well organized," she "had

all materials available," and "most students were on task during the observation."  (Pl's

Opp., Ex. L).  However, Keefe noted that problems remained as "several students need

special attention to keep them on task," which Keefe noted could be surmounted if

Corrales were to let "the aide . . . be the one to run interference with groups for

discipline so that [Corrales] can concentrate on [her] main group of instruction."  (Id.)

Nonetheless, the year-end evaluation form completed by Keefe on May 16, 2006,

like the form from the year before at Edgemont Elementary, gave Corrales

"Satisfactory" marks in all performance categories, including that for the "Establishment

4

and Maintenance of a Suitable Learning Environment," but in the comments section

Keefe gave the following admonition to Corrales:

> Mrs. Corrales has worked hard with a difficult assignment of
> students with multiple needs . . . . She will need to work on
> behavior modification for some students to insure a quiet
> and contained class during lessons.  It would also assist her
> to learn more about intervention techniques to work with
> difficult special education students.

(Pl's Opp., Ex. F).

At the end of the 2005 to 2006 school year, Corrales earned her CLEAR

credential, which is the highest teaching credential in California for special education.

Keefe's observations of Corrales' teaching in the classroom for the following 2006

to 2007 school year similarly showed progress from the deficiencies he had identified

earlier during his observation in November 30, 2005.  Thus, in his October 20, 2006,

observation, Keefe complimented Corrales with providing a "very good" "classroom

environment."  He noted that Corrales' "spacing is very good" with her students and that

her "aides are well suited to the population and you have given them responsibilities to

keep yourself free to teach."  (Pl's Opp., Ex. O).  As Keefe noted, "I see growth in your

structure from last year."  Nonetheless, Keefe reminded Corrales to "continue to work

on behavior modifications with this class.  Many students are in need of the routine and

structure.  The class needs to get into their academics sooner [in the day." (Id.).  The

progress in Corrales' handling of her classroom continued when Keefe observed her

class in December 11, 2006, with him noting that Corrales had "the aides well trained to

take care of problems so you do not have to stop the lesson to handle discipline," but

continued to note that Corrales' "biggest problem" is "the calling out" from students; "it is

disruptive to the pacing of your lesson but understandable in SDC students.  You have

demonstrated methods to control this activity and are implementing it.  The aides should

continue to care for the disruptive ones so you can continue to teach.  Work on methods

to control the noise level so you can be more effective."  (Pl's Opp., Ex. M).  Keefe's

final observation taken on February 14, 2007, contrasts markedly from his initial

assessment back in November 30, 2005.  Keefe noted that the student study "groups

were working well and the work was appropriate for their skill levels.  Aides were

cognizant of the needs of students and intervened with the one student who wanted to

wander.  Core materials were being used and all personnel kept students on task during

the observation period with the exception of the one boy.  You switched back and forth

between the two boys with different assignments in a fluid manner."  (Pl's Opp., Ex. N).

Although Keefe ended his observation form asking whether Corrales had a "behavior

plan for the [one] student who was wandering the room," Corrales informed Keefe that

the student is "on the behavior chart" and that she had a "meeting" with the student's

parents about it.  (Id.).

　　　In February, 2007, Corrales was informed that the school district was not going to

re-elect/renew her for a teaching position with the district for the 2007 - 2008 school

year.

　　　Corrales' last year-end evaluation, dated May 9, 2007, more than three months

after having been informed of the school district's decision to not re-elect her for the

coming school year, is noticeable in one respect from her two prior year-end evaluations

--- it contained for the first time a "Needs to Improve" mark in one of the performance

categories, namely, "The Establishment and Maintenance of a Suitable Learning

6

Environment."  Although such a mark is not the lowest one possible (that being left for "Unsatisfactory") and Corrales did receive "Satisfactory" marks for the remainder of the performance criteria, Keefe added the following comment to his evaluation:  "The area she needs to improve in is the suitable learning environment.  Students still call out, get out of chairs, disrupt others and interfere with the learning of classmates.  Mrs. Corrales has taken a class in behavior management and has utilized some of the techniques in her room.  A plan of improvement will be attached to this evaluation for assistance to her."  (Pl's Opp., Ex. H).   Afterwards, Keefe told Corrales that he would have a psychologist assist her with the behavior management of her classroom.  The same month, Keefe presented Corrales with a remediation plan, in which one of the items was that a school site administrator would assist Corrales in removing students from her classroom when appropriate.  Corrales had not received this assistance beforehand. Less than a month later on June 6, 2007, Corrales met with Keefe and was advised that she met all of her objectives in the Remediation Plan.

### B.  Corrales' Alleged Protected Activity

During the 2006 to 2007 school year, the school district placed students in Corrales' class that she believed posed a danger to themselves and others.  (Decl. Maria Corrales ¶ 23).  Corrales advocated for these students as well as her other students who were being assaulted and their education disrupted by these students. Keefe said he would request assistance from the school district's Department of Special Education, no assistance was forthcoming and the situation continued all year.  (Id.)

Specifically, during the 2006 to 2007 school year a child who was significantly autistic was placed in Corrales' class and remained all year despite the fact that

7

Corrales requested to Keefe and the school district that the student be assessed for the autistic classroom. (Id.¶ 24). The student could not be controlled because, among other things, he was non-verbal, he ran out of the classroom, and would punch other students with a closed fist. (Id.) Corrales asked for further evaluations of this student all year, but no assessments were forthcoming from the school district. During this same school year, Corrales reported to Keefe and the school district that a particular student in her class needed to be assessed for placement in the Emotionally Disturbed class because the student bit and chocked other students. (Id.¶ 25). For instance, on April 4, 2006, Corrales e-mailed district officials asking for the student's "assessment . . . to see if he qualified for AB2726" to which Keefe responded that "no formal assessment [is] required in order to refer a student to the Dept. of Mental Health via AB2726." (Pl's Opp., Ex. D8). Later on November 16, 2006, Corrales' e-mailed school officials pleading that "these students need to be re-assessed or observed!  I am having such a difficult time with both [students] because they won't follow routine or curriculum even if modified.  I think they need a one on one or change of placement.  Please get back to me as soon as you can." (Pl's Opp., Ex. D12).

   As noted previously, in February, 2007, Corrales was informed that the school district was not going to re-elect/renew her for the 2007 - 2008 school year.  Corrales inquired as to the rationale for the decision not to re-elect her position.  She was advised by the school district's Human Resource Director, Mr. Hassan, that it did not need to have a reason and referred her to California Education Code section 44929.1 regarding "No Cause." (Decl. Maria Corrales ¶ 27).  At that point, Mr. Hassan asked Corrales to sign a resignation letter, but she refused. (Id.)  Mr. Hassan then threatened

8

Corrales that if she did not resign the school district would withhold a job reference for her.  (Id.)

Immediately upon learning of the district's decision not to re-elect, Corrales voiced her belief that her contract was not being renewed as a direct result of the school district retaliating against her for her advocacy on behalf of special education students. She voiced this opinion until the end of the school year.  (Id.)

Michael Keefe had the authority to non re-elect Corrales and chose to do so. Keefe's later-articulated reason for doing so was due to his observation of Corrales' lack of organization and control of her classroom environment over the 2005 - 2006 and 2006 - 2007 school years, as reflected in his observations and year-end evaluations.

After the February, 2007, non-re-elect decision, the school district not only continued to fail to address the issues of the autistic and the emotionally disturbed students, but it also placed another disruptive student diagnosed with an intermittent explosive disorder in Corrales' classroom.  (Id. ¶30).   From February, 2007, going forward Corrales continued to ask the school district for an assessment of her students that were having emotional outbursts and assaulting other students in the class.  Each time the school district failed to address Corrales' concerns, with school site administrators not responding to Corrales when she notified them of a crisis in her room.

Corrales sued the school district, alleging retaliation claims under the Rehabilitation Act and Title VII as well as a state law claim for violation of California Labor Code section 1102.5.  Corrales has since abandoned her Title VII claim.  (Opp. at 1 ("Plaintiff has agreed to dismiss her claim under Title VII")).

9

IV.  Analysis

A.  Rehabilitation Act

Claims under the Rehabilitation Act are analyzed under the same standard as those brought under the Americans with Disability Act ("ADA"), which itself was modeled after the Rehabilitation Act.  See Douglas v. California Dep't of Youth Authority, 285 F.3d 1226, 1229 n.3 (9th Cir. 2002) (noting that cases interpreting the ADA and the Rehabilitation Act are "interchangeable"); Boose v. Tri-County Metropolitan Transp. Dist. of Oregon, 587 F.3d 997, 1000 n.5 (9th Cir. 2009) (noting "courts have applied the same analysis to claims brought under both statutes").  Accordingly, the legal elements and the production of proof for a retaliation claim under the Rehabilitation Act is the same as that used under the ADA, namely, that in the absence of direct evidence of retaliation, a plaintiff may rely on the burden-shifting framework used for proving discrimination claims under Title VII as articulated in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-04 (1973).  Specifically, Corrales must first establish a prima facie case of retaliation by showing that (1) she engaged in protected activity; (2) she suffered a materially adverse action by the school district; and (3) there existed a causal connection between the protected activity and the school district's adverse action.  See Barnett v. U.S. Air, Inc., 228 F.3d 1105, 1121 (9th Cir. 2000) (applying Title VII framework for analyzing ADA retaliation claims), vacated on other grounds, 535 U.S. 391 (2002); Brown v. City of Tucson, 336 F.3d 1181, 1186-87 (9th Cir. 2003) (same); see also Reinhardt v. Albuquerque Public Sch. Bd. of Education, 595 F.3d 1126, 1131 (10th Cir. 2010) (applying McDonnell Douglas framework to Rehabilitation Act retaliation claims).  If a prima facie case is established, then it is up to the employer to provide

10

evidence of a legitimate, non-retaliatory reason for the adverse action.  Id.  Once the employer does so, the plaintiff must show that the proffered reason is pretextual.  Id.

The school district has raised four arguments against Corrales' Rehabilitation Act retaliation claim:  (1) The activity Corrales engaged in was not protected as it amounted to little more than her "complaints about her job duties" with no discussion of "discrimination against her students"; (2) the lack of a causal connection between the protected activity and the alleged retaliatory action, that is, the district's decision not to re-elect her for the forthcoming school year; (3) the existence of a non-discriminatory reason for the adverse employment decision, namely, Corrales' poor performance in the classroom; and (4) Corrales lacks standing to pursue such a claim as she cannot show that the students in question where part of a program that was directly receiving federal funding.  (Mot. Summ. J. at 9-12; Reply at 5).  None of these arguments withstand scrutiny.

### 1.  Protected Activity

The school district labels the e-mail communications submitted by Corrales as nothing more than her lodging complaints about her job duties by "telling of problems she was having with various disabled students and asking for different placement or help with them."  (Reply at 5).  The school district's reading of the e-mails in question and of its notion of what constitutes "protected activity" is too cramped.

As the Tenth Circuit has noted, "protected activity must go beyond merely assisting special education students but[, instead, requires] 'affirmative action in advocating for, or protesting discrimination related to, unlawful conduct by others . . . .'" Reinhardt, 595 F.3d at 1132 (quoting Montanye v. Wissahickon Sch. Dist., 218

11

Fed.Appx. 126, 131 (3rd Cir. 2007)); see also <u>Sumner v. Postal Serv.</u>, 899 F.2d 203, 209 (2nd Cir. 1990) (finding that "protected conduct" encompassed the following forms of activity "making complaints to management," "writing critical letters," "protesting discrimination," and "expressing support of co-workers").  So long as a message is conveyed by the teacher to school district officials that evinces such a critical assessment or advocacy on behalf of special education students having the legal protections afforded to them by the Individuals with Disabilities Act ("IDEA") be met or gives notice that those needs are not being met, then the teacher has engaged in protected activity.

A teacher need not engage in submitting a lengthy account outlining in detail those failings and tying them to particular provisions of the IDEA to fall within the protection of the Rehabilitation Act's anti-retaliation provisions.  See <u>Settlegoode v. Portland Public Schs</u>, 371 F.3d 503, 507 (9th Cir. 2004) (finding teacher engaged in protected activity when she submitted "a ten-page letter expressing [the teacher's] concern that the [school's] program suffered from problems of 'systematic discrimination, maladministration, access, pedagogy, curriculum, equity, and parity,' and 'greatly compromised' federal law [as well as] describ[ing the teacher's] negative experiences in several different schools in the district, comparing the treatment of disabled students to that of black students before the Civil Rights Movement").  Certainly, the teacher must express something to others about her concerns with the treatment of their disabled students; merely helping students in the class or in attending therapy sessions will not do.  See <u>Reinhardt</u>, 595 F.3d at 1132 ("protected activity must go beyond merely assisting special education students"); see also <u>Montanye</u>, 218

12

Fed.Appx. at 131.  Thus, in <u>Reinhardt</u> the Tenth Circuit found that a teacher engaged in protected activity when she "regularly complained" to school officials "that she was not receiving accurate and timely caseload lists of students" which she felt lead to her students "not receiving speech and language services" and the teacher "advocated for the rights of a particular . . . student . . . to receive a neuropsychological evaluation [and later] to receive specialized reading instruction."  595 F.3d at 1130, 1132 (labeling these two forms of advocacy as "constitute[ing] protected activity under the Rehabilitation Act").

Corrales engaged in much the same form of activity as the teacher in <u>Reinhardt</u>: She asked the school district to provide certain evaluations for specific students that she felt were needed to assist them in their education and then complained when she felt such acts had not been taken by the school district.  In light of this activity, the Court finds that Corrales did engage in protected activity and therefore meets the first element of her prima facie case.

### 2.  Causal Connection

The school district next argues that Corrales cannot establish a causal link between her protected activity and the decision not to re-elect her because she began to air her complaints with the school district almost two years before the decision not to re-elect was made.  (Mot. Summ. J. at 9, 10 ("plaintiff began her complaints regarding civil rights violations in the 2005-2006 school year.  Plaintiff was non-reelected for the 2007-2008 school year, almost two years after she began her complaints")).  The problem with this argument is that it completely ignores the fact that Corrales' complaints continued up and until the time the district took its adverse action.  There are

13

documented e-mails from Corrales respecting the need for evaluation of her students up to April 19, 2007, (Pl's Opp., Ex. D1 (wherein Corrales informed the school's program specialist that "[student x] needs a change of placement, [x] has been defiant everyday this week.  Today, she choked two students one in the presence of Mr. Keefe.  [x] was not suspended but was sent home")), and in her sworn declaration Corrales' mentions that she voiced these complaints either verbally or by way of email to Principal Keefe and/or the school's director for special education up "until the end of the 2007 school year."  (Decl. Maria Corrales  10).  Thus, there were no gap in time between the protected activity and the termination.  Such continuous activity places it "very close" in time to the alleged retaliatory act so as to create a permissible inference that there was a connection between the two. See <u>Pardi v. Kaiser Foundation Hospitals</u>, 389 F.3d 840, 850 (9th Cir. 2004) ("When adverse employment decisions closely follow complaints of discrimination, retaliatory intent may be inferred").  That such protected activity occurred over a more protracted period, rather than resulting in immediate adverse action by the school district when it first started, could be circumstantial proof that either diminishes the causal effect of the protected activity (that is, the employer failure to act earlier demonstrates that it did not think much of it) or as an indication that such activity created a slow boil with the employer eventually growing weary of it and acting accordingly.  Which inference should be drawn is left for the trier of fact to consider in evaluating Corrales' claim at trial, not a question left to resolve at summary judgment where all permissible inferences are drawn in favor of the non-moving party (here, Corrales).

3.  Pretext

14

Corrales having established a prima facie case, the school district has come forward with a legitimate, non-retaliatory reason for its adverse action --- that it did not choose to re-elect Corrales for the 2007 - 2008 school year because of Keefe's "observation of [Corrales'] lack of organization and control of her classroom environment over the 2005-2006 and 2006-2007 school years, as reflected in his evaluations."  (Mot. Summ. J. at 3).  Corrales is thus under the burden to prove that this asserted rationale is a pretext.

Pretext may be shown either (1) by persuading the jury that a discriminatory motive more likely than not motivated the employer or (2) indirectly by showing that the employer's proffered explanation is unworthy of credence.  Winarto v. Toshiba America Electronics Components, Inc., 274 F.3d 1276, 1284 (9th Cir. 2001).  To establish pretext, "very little" direct evidence of discriminatory motive is sufficient, but if circumstantial evidence is offered, such evidence has to be "specific" and "substantial."  Id.; see also Little v. Windermere Relocation, Inc., 265 F.3d 903, 915 (9th Cir.2001).

To that end, Corrales notes not only the close proximity in time between her protected activity and the school district's adverse action, but also points to the factual record to question the credibility of the district's proffered rationale for its decision. Corrales attempts to do so by arguing that Keefe's sharpest criticism of her work performance was made during the 2005 to 2006 school years (notably the November 30, 2005, observation form), and yet in the year-end evaluation he completed in May, 2006, he gave her the highest marks possible for all performance categories, including for that directly related to the maintenance of behavior in students.  Moreover, Corrales also notes that the ensuing 2006 to 2007 school year was even more noteworthy in how

15

Keefe noted positive changes in Corrales' performance from the prior year.  From this Corrales' argues that if her work performance was the reason for the district's decision not to re-elect her, it would have been made by the school district after the 2005 -2006 school year and not the following year after the school's principal made notations of improvements in Corrales' performance.  Instead, the opposite occurred with the school district giving her a positive year-end evaluation after the 2005 - 2006 school year, but then giving her lower marks after the 2006 - 2007 school year and even then such lower marks were made after it took the adverse action that is the focus of the lawsuit.  (Opp. at 8 ("plaintiff was not evaluated poorly until after she had been advised of her non-reelect"), 10 & 12 ("when these observation forms completed for the 2005 to 2006 school year and 2006 to 2007 school year are read in their entirety, they demonstrate that plaintiff's teaching skills and behavior management skills were good during the 2005 to 2006 school year and even better during the 2006 to 2007 school year).

Such discrepancies between the evaluations leading up and after the adverse action are certainly for a trier of fact to consider in deciding what was the true motivation for of school district.  An unwarranted reduction in performance review scores can constitute evidence of pretext in retaliation cases.  See Yartzoff v. Thomas, 809 F.2d 1371, 1377 (9th Cir.1987) (citing the following evidence as creating a genuine issue of fact as to "whether the proffered explanations are pretextual[:] . . .  Yartzoff introduced evidence that for years prior to the filing of his complaints, he had always received performance ratings of average and above average on all employment indices. Following the filing of his administrative complaints and his April 1980 meeting with his supervisor to discuss his Title VII grievances, however, he received a sub-average

rating for cooperativeness for the first time"); cf. <u>Steiner v. Showboat Operating Co.</u>, 25 F.3d 1459, 1465 (9th Cir. 1994) (low marks satisfy prima facie case, but in this case were insufficient to prove pretext).

The school district seeks to counter this framing of the factual record by noting that questions of Corrales' handling of modify the behavior of her students continued to haunt her performance throughout the 2005 to 2007 school years.  And that is true.  The point, however, is with the school district's response to that performance issue.  At the conclusion of the 2005 to 2006 school year when the performance issues were at their apex cutting across many different categories, Corrales nonetheless was given the highest marks possible in all performance categories.  Yet the following year the district gave her a lower mark (although not the lowest possible) in one category even though Keefe's observation forms showed marked improvement in Corrales' work performance, and even more problematic is that the decision to give such a lower mark occurred after the district had taken the adverse action that is at issue.  Under these circumstances there certainly arises a genuine issue of material fact on whether the lower mark and the performance issue in general were nothing more than an attempt by the school district to backfill a non-retaliatory reason for its decision.

In this respect the present case is not unlike that in <u>Cicero v. Borg-Warner Automotive, Inc</u>., 280 F.3d 579 (6th Cir. 2002).  In that case, the employer stated that it fired the plaintiff because of his "poor performance," yet the plaintiff was able to adduce evidence showing that "it never raised any serious complaints about his performance until after it fired him" and that until the time of his firing the employer had actually "praise [the employee's] work and award him performance-based bonuses."  <u>Id</u>. at

591-92.  The court not only noted that such evidence placed into dispute what was the employer's true motive for its decision, but also found equally troubling the employer's acts post-termination in which it then raised for the first time in performance evaluations its concerns with the employee's performance.  Id. at 592 ("he also offers evidence that the falsity masked discriminatory animus.  It was not until after Borg-Warner fired him that it raised serious complaints about his performance").  Much of the same criticism can be levied at the school district's proffered "poor performance" rationale in this case.  Although unlike in Cicero performance issues were voiced to Corrales prior to the adverse action, the district did not account for these concerns in its ratings of Corrales at the end of the 2005 to 2006 school year.  Moreover, the strength and legitimacy of the concerns that had been levied in the preceding year by the school district were undermined the following year by the principal's observations of Corrales' performance which showed notable improvement.  Capping this off is the fact is that it was not until after the adverse action (and after the district had noted improvements in Corrales' performance) that the school district took action on its concerns with Corrales' performance by not only giving her a lower mark in one performance category but also in requiring that she engage in a remediation plan.  The disconnect between the district's concerns and the actions it took relative to the date of the adverse action create, just as in Cicero, a genuine issue of material fact as to whether the district had a retaliatory motive in taking its adverse action.

Accordingly, the Court finds that there exists a genuine issue of material fact as to the district's motivation in deciding not to re-elect Corrales for the 2007 to 2008 school year.

4.  Standing

As to the final argument, the school district's focus on the fact that "the program" Corrales' students were involved in "did not receive federal financial assistance" is misplaced.  The school district does not deny that it receives federal financial assistance "in the generic sense of the word," (Mot. Summ. J. at 11), but it contends that the financial assistance must directly touch or reach the specific program or activity in question for the Rehabilitation Act's anti-retaliation prohibitions to apply.  For this proposition, the school district cites to a nearly three decades old Fifth Circuit decision, Brown v. Sibley, 650 F.2d 760 (5th Cir. 1981).  Although the Brown decision does indeed support this proposition, what the school district remarkably fails to acknowledge is that the Fifth Circuit's decision was superseded by the passage of the Civil Rights Restoration Act of 1987 which amended the definition of "program or activity receiving federal financial assistance" under the Rehabilitation Act to include all operators of a department, agency, special purpose district.  The amendment was designed to overturn cases like Brown which had interpreted the Rehabilitation Act to apply only to specific programs that directly received federal financial aid, and not to programs that received no federal financial aid, even if other programs within the same institution did receive such aid.  See Innovative Health Sys., Inc. v. City of White Plains, 931 F. Supp. 222, 234 (S.D.N.Y. 1996) (noting that decision in Brown was overturned by passage of the 1987 amendment).  Given that this is precisely the same interpretation the school district now seeks for the Court to supply to the Rehabilitation Act, it is contrary to the statute as amended post-Brown.

B.  State Law Claim

19

Much of the school district's arguments directed against Corrales' state law claim mirror those lodged against her federal Rehabilitation Act claim.  The Court's disposition of those arguments for the federal claim apply equally to those lodged against the state law counterpart.  One issue, however, is different and distinct than that lodged against the Rehabilitation Act claim --- the school district's contention that maintenance of the pendent state law claim against it would transgress the Eleventh Amendment.  See Pennhurst State Sch. & Hosp. v. Halderman, 465 U.S. 89, 121 (1984) ("neither pendent jurisdiction nor any other basis of jurisdiction may override the Eleventh Amendment. . . . [and observing that] Eleventh Amendment [applies] to pendent state-law claims"); Pena v. Gardner, 976 F.2d 469, 473 (9th Cir. 1992) ("A state law claim pendent to a federal claim that survives eleventh amendment analysis must itself be subjected to eleventh amendment scrutiny").  The school district's argument is well-taken.  The Ninth Circuit has found that school districts in California are an agent of the state, that they perform state governmental functions and that, because a judgment against a school district would be satisfied out of state funds, school districts are immune from suit by the Eleventh Amendment.  See Belanger v. Madera Unif. Sch. Dist., 963 F.2d 248, 254-55 (9th Cir. 1992).  Accordingly, the Eleventh Amendment bars this Court from exercising pendent jurisdiction over Corrales' state law claim.

V.  Conclusion

Accordingly, for the reasons stated above, the school district's motion for summary judgment on Corrales' Rehabilitation Act claim is **DENIED.**  The school district's motion for summary judgment on Corrales' California Labor Code section 1102.5 claim is **GRANTED**.

20

Corrales' Title VII claim is **DISMISSED** with prejudice.  <u>See</u> Fed. R. Civ. P.

41(a)(2).

The Case Manager shall schedule a telephone status conference to chart the

future course of the case.

**SO ORDERED**.


 S/Avern Cohn
AVERN COHN
UNITED STATES DISTRICT JUDGE


Dated:  June 10, 2010


I hereby certify that a copy of the foregoing document was mailed to the attorneys of
record on this date, June 10, 2010, by electronic and/or ordinary mail.


 S/Julie Owens
Case Manager, (313) 234-5160

21